******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DANIEL CARTER *v.* STATE OF CONNECTICUT
(AC 36184)

Sheldon, Mullins and Harper, Js.

*Argued February 18—officially released August 11, 2015*

(Appeal from Superior Court, judicial district of New Haven, Young, J.)

*Damon A. R. Kirschbaum*, with whom, on the brief, were *Vishal K. Garg* and *Kevin W. Munn*, certified legal

intern, for the appellant (petitioner).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David Clifton*, assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. The petitioner, Daniel Carter, appeals from the judgment of the trial court dismissing his petition for a new trial, in which he challenged his conviction for aggravated sexual assault in the first degree in violation of General Statutes § 53a-70a (a) (1), attempt to commit aggravated sexual assault in the first degree in violation General Statutes § 53a-49 (a) (2) and § 53a-70a (a) (1), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), and commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k on the ground of newly discovered DNA evidence. The narrow issue before this court is whether the trial court properly determined that the mode of DNA testing available at the time of the petitioner's criminal trial in 1996, the Polymarker and DQ-Alpha test (Polymarker/DQ-Alpha test), could have been utilized to eliminate the petitioner as a possible contributor of DNA to certain biological evidence found at the crime scene, thus preventing the petitioner from establishing that the exculpatory results of more recent DNA testing of such evidence by the Short Tandem Repeat (STR) method in 2008 constitute newly discovered evidence. We conclude that the petitioner failed to show that the DNA results from the STR testing constitute newly discovered evidence and, therefore, affirm the judgment of the trial court.

The following facts from the petitioner's criminal trial and procedural history are relevant to this appeal. The petitioner's conviction stemmed from a kidnapping and sexual assault that occurred in the early morning hours of May 24, 1995. At the time of the incident, the victim, a self-identified chronic drug abuser, was battling a $300 a day crack cocaine habit. To support her habit, the victim frequently stole and engaged in prostitution. On May 24, 1995, at approximately 2 a.m., the victim left the apartment she shared with her fiancé in the Fair Haven section of New Haven to purchase and smoke crack cocaine. She had last smoked crack cocaine around 1:30 a.m. and was craving more. The victim had walked about four blocks when she saw a man in a burgundy car "driving around [her]." She approached the car, and the man, who had his window open, offered her a ride. The area was illuminated by streetlights, and thus she was able to see the man's face. He was a black male, heavy set, with thick glasses, very short hair, and a "little mustache." He said his name was "Devon."

The victim got into the car, and the man agreed to take her to Quinnipiac Avenue. Shortly thereafter, he said he had to make a quick stop. He stopped the car on Bailey Street, sat back in his seat, and reached down and pulled out a "big black gun." The victim heard a clicking noise, which she immediately recognized as the sound of a gun being cocked. The man put the gun

to the victim's head and told her that if she did what he said, he would not harm her. He ordered the victim to perform oral sex on him. Fearing for her safety, she did so. After a few minutes, he told the victim to remove her pants. The victim partially disrobed, removing one of her pant legs. The man, still holding the gun to the victim's head, penetrated her vaginally with his penis. He told the victim to turn over, and then he attempted to penetrate her anally. The victim testified that "it was hurting so bad, I started to holler and cry real loud." He stopped, told the victim to stop crying, and handed her some tissues from a tissue box on the backseat of the car to wipe her eyes. He then penetrated the victim vaginally a second time and ejaculated inside her.[1] When he had finished assaulting the victim, he got off of her, put the gun down, wiped his penis off with tissues from the backseat, and threw them out of the car window. After he had zipped up his pants, he drove down the street, took a right, and dropped the victim off at the corner at her request. He then backed his car all the way up the street, and left.

The victim, who had a criminal record and was on probation, did not initially report the incident to the police. Instead, she went home, showered, and went to bed. The next morning, the victim met with her probation officer, Lisa D'Amato, at the Office of Adult Probation in New Haven.[2] As the victim was exiting D'Amato's office, she saw a man in the hallway whom she immediately recognized as the man who had sexually assaulted her. The victim went back into D'Amato's office and told her that she had been raped and that she had just identified the man who had done it. D'Amato contacted the police, and the victim went home, where she was interviewed by Officer Martin D'Adio of the New Haven Police Department. Shortly thereafter, the victim gave D'Adio descriptions of her assailant and his vehicle. She described the vehicle as a red, two door sedan. The victim later identified the petitioner in a showup identification conducted on the street outside of the probation office. The police located the petitioner's vehicle parked on State Street, across from the probation office. The victim accompanied police officers to that location, where she identified the vehicle as that driven by her assailant. The victim told D'Adio that he would find a box of tissues on the backseat of the vehicle. When D'Adio looked inside the vehicle, he confirmed that there was a box of tissues on the backseat. The victim then directed D'Adio to the location where the assault allegedly had taken place. The victim pointed out several tissues soiled with fecal matter lying on the ground, and identified them as the tissues that the petitioner had used to wipe himself off with following the assault. D'Adio seized the tissues and bagged them as evidence.[3]

D'Adio then drove the victim to Yale-New Haven Hospital, where she was treated for sexual assault. A foren-

sic examination was performed and biological evidence for a rape kit was collected. The victim reported to attending medical personnel that she had been raped, anally, orally and vaginally, at gunpoint.

The police later executed a search warrant at the petitioner's home, where they seized a black, semiautomatic handgun and a magazine from the second drawer of a bureau in the bedroom. The petitioner's wife testified that the handgun was in the drawer when the petitioner left for work on the evening of the alleged assault, and that it was still in the drawer at 2 a.m. The petitioner's car also was seized. Detective Christopher Grice testified concerning the forensic investigation of the petitioner's vehicle. Grice testified that he had lifted a latent print from the exterior passenger side door of the vehicle that was consistent with the victim's right thumbprint. Detective Robert Benson also examined the print and confirmed the identification.

The petitioner agreed to be interviewed by the police. The petitioner stated that he had been working at the Howmet Corporation in North Haven on the morning of the assault. A subsequent check by the police of the petitioner's employment records, however, revealed that he had clocked out of work at 1:44 a.m. on May 24. The petitioner's supervisor at Howmet, Steve Nilsen, related to the police that, on that day, the petitioner had told him that his mother-in-law had died suddenly, and therefore that he was needed at home. Nilsen did not see the petitioner for the remainder of the shift. The police subsequently determined, after speaking with the petitioner's wife, that his mother-in-law was still alive and living in Hartford. When confronted by the police about his employment records—specifically, his recorded 1:44 a.m. departure time—the petitioner maintained that he had been at work for his full shift on May 24, and suggested that he must have forgotten to clock back in after his break. Unprompted, the petitioner further offered that, on the day of the assault, he had had sexual intercourse with an old friend named Charmilla Brooks. He stated that this sexual encounter took place in the front seat of his vehicle at a McDonald's restaurant around 10 a.m. Police investigators were unable to locate a person named Charmilla Brooks.

Beryl Novitch, a biochemist with the Connecticut Forensic Science Laboratory (laboratory), was called as a defense witness. Novitch testified concerning her examination of the biological samples collected by medical personnel who treated the victim for sexual assault, the soiled tissues collected at the crime scene, and the tissue box found on the backseat of the petitioner's vehicle. Novitch testified that the tests she performed on these items did not detect the presence of spermatozoa or seminal fluid. She was able to detect the presence of fecal matter on the tissues found at the crime scene.

On cross-examination, the prosecutor elicited testimony that the waffle design on the soiled tissues did not match the waffle design on the tissues found in the open tissue box in the petitioner's vehicle. Although the difference in the waffle design was not highlighted for the jury in the state's closing argument, the prosecutor did argue, consistent with D'Adio's testimony, that the soiled tissues at the crime scene had been collected by the police out of prudence, even though it could not be determined whether they had any connection to the assault.[4]

On the basis of the previously described evidence, the jury found the petitioner guilty of two counts of aggravated sexual assault in the first degree, attempt to commit aggravated sexual assault in the first degree, kidnapping in the first degree, and commission of a class A, B or C felony with a firearm. The court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of seventy years incarceration. This court affirmed the petitioner's conviction in a per curiam decision; see *State* v. *Carter*, 45 Conn. App. 919, 696 A.2d 1322 (1997); and our Supreme Court denied certification to appeal. *State* v. *Carter*, 243 Conn. 911, 701 A.2d 334 (1997).

In 2008, the petitioner filed a consent petition pursuant to General Statutes § 54-102kk,[5] requesting that the soiled tissues recovered at the crime scene be subjected to DNA testing. Neither the state nor the defense had requested DNA testing in 1995 or 1996. Based on the results of the DNA testing, which excluded the petitioner as a possible contributor of DNA to the biological material on the tissues, the petitioner filed the present petition for a new trial pursuant to General Statutes § 52-270. His petition was based on a claim of newly discovered evidence, which was supported by allegations that "[t]he DNA testing procedures used for casework by the Connecticut Forensic Science Laboratory before June 6, 1996, would not have been capable of identifying DNA profiles from the biological material recovered from the tissues." The petitioner further alleged, on that basis, that "the results of the DNA testing are newly discovered evidence that was not discoverable or available at the time of the original trial."

A hearing on the petition was held on March 6, 2013. The petitioner presented the testimony of a single witness, Dr. Carll Ladd, a senior supervisor assigned to the DNA unit at the laboratory. Ladd testified about the following: the manner in which DNA evidence is currently collected and analyzed at the laboratory using the STR method; the results of DNA testing of the evidence samples collected in the petitioner's case using the STR method; and the likely results of DNA testing of such evidence samples using the Polymarker/DQ-Alpha method, had such testing been conducted at the

time of the underlying criminal investigation and the petitioner's resulting criminal trial in 1995 and 1996, respectively.

According to Ladd's testimony, both STR testing and Polymarker/DQ-Alpha testing rely on a technique known as Polymerase Chain Reaction (PCR), which enables examiners to take a very small sample of biological evidence from a crime scene and amplify it in volume to create a usable quantity of testable DNA. Both procedures involve four common steps. The first step, extraction, is the isolation of the DNA from the biological material in the evidence sample, and the isolation of the DNA from the exemplar taken from the individual whose DNA is being compared to the DNA of unknown origin. The second step is quantitation, which is the process by which the amount of available DNA is determined. The third step is amplification, a sort of "molecular xeroxing" process that enables examiners to duplicate the available DNA in the evidence sample to facilitate an identification.[6] In the fourth step of the procedure, the PCR products that have been generated are separated on the basis of their size, and a DNA profile is created. The same technique is applied to the DNA of known origin, and the two profiles are then compared. If the genetic markers on the known DNA profile and the unknown DNA profile are identical, there is a "match," and the known individual is included as a possible source of the unknown DNA. If there is no match, the DNA samples are considered to be from different sources, and the known individual is excluded as a potential contributor to the evidence sample.

At the time of the petitioner's criminal trial, the DNA unit at the laboratory used the Polymarker/DQ-Alpha test. This PCR based testing process generated a DNA profile using DNA sequences from six locations, or loci, on the DNA molecule. The Polymarker/DQ-Alpha test had a random match probability of approximately 1 in 3000, which means that the expected frequency with which the DNA profile of an individual selected at random would match the DNA profile generated from the tested sample was approximately 1 in 3000.

In 1999, a more sophisticated form of PCR based testing, known as STR testing, replaced the Polymarker/DQ-Alpha test. STR testing determines the numbers of short repeat sequences that appear in tandem at fifteen different loci on the DNA molecule. DNA of unknown origin, the evidence sample, is amplified using PCR, and a DNA profile is generated based upon the number of short tandem repeats that appear at each locus. Because the DNA profile is generated based upon data from fifteen loci on the DNA molecule, STR testing is more discriminating than preexisting testing methods such as the Polymarker/DQ-Alpha test that examined data from fewer DNA loci. STR testing enables examiners to obtain results with less genetic material than

earlier testing methods made possible. Thus, for example, whereas Polymarker/DQ-Alpha testing required 100 copies of the DNA molecule to create a usable DNA profile, STR testing can produce a usable profile with only ten copies of the DNA molecule.

With both STR testing and Polymarker/DQ-Alpha testing, the DNA profile that is generated from the evidence sample is compared to the DNA profile generated from a sample of known origin, and that comparison is used to determine whether the source of the known sample must be excluded or can be included as a possible source of the evidence sample of DNA. Because STR testing is far more discriminating, in optimal cases, the random match probability is less than 1 in 7 billion, a figure chosen because it is the estimated human population living on the earth.[7]

In the petitioner's case, five evidence samples were taken from the tissues recovered at the crime scene and analyzed using STR testing. Four of these samples contained enough genetic material to generate a usable DNA profile. The DNA profile generated from these four samples was compared to the petitioner's DNA profile, and he was excluded as a possible contributor to the DNA from the tissue samples.

The petitioner's counsel sought to elicit testimony that because the Polymarker/DQ-Alpha testing available in 1995 and 1996 required more genetic material to generate a DNA profile than STR testing, a DNA profile could not have been generated from the genetic material on the tissues at the time of the petitioner's criminal trial. Ladd testified, however, that the samples with sufficient genetic material to generate a DNA profile using STR testing in 2008 would have been capable of generating a DNA profile using the Polymarker/DQ-Alpha testing available in 1995 and 1996. Ladd testified that three of the four samples submitted for testing in 2008 contained an optimal amount of genetic material, and one sample contained an amount that, although not optimal, was sufficient to generate a usable DNA profile.

The petitioner's counsel then asked Ladd whether the presence of PCR inhibitors may have prevented a DNA profile from being generated using the older technology.[8] Ladd stated that, based on the testing performed in 2008, there was no evidence of any problem arising from the presence of PCR inhibitors. Because no DNA testing was performed in 1995 and 1996, Ladd could not "categorically eliminate" the possibility that PCR inhibitors may have been present then. He stated, however, that "to a reasonable degree of scientific certainty," he expected that a usable DNA profile could have been generated using Polymarker/DQ-Alpha testing.

Finally, Ladd testified concerning the frequency of use of DNA testing in criminal cases in 1995 and 1996.

Ladd testified that the DNA unit at the laboratory worked on twenty-five cases in 1995 and approximately forty cases in 1996. He could not recall how many times examiners testified in criminal trials in 1995 and 1996, except to say that it was a limited number of times. Ladd testified that in recent years, by contrast, the DNA unit has handled approximately 1000 cases per year.

At the close of the petitioner's case, the state moved to dismiss the petition for a new trial pursuant to Practice Book § 15-8 for failure to establish a prima facie case. The court reserved judgment on the state's motion to dismiss. The state rested without presenting any evidence. After receiving posttrial briefs from the parties, the court issued a memorandum of decision. On the basis of the evidence presented, the court concluded that the petitioner had failed to present evidence that the DNA technology available at the time of his trial could not have been utilized to exclude him as a contributor of DNA to the biological evidence on the soiled tissues, thus foreclosing his claim that the results from the DNA testing performed in 2008 constituted newly discovered evidence under § 52-270. The court thus dismissed the petition for a new trial.[9] The court thereafter granted the petitioner's petition for certification to appeal, and this appeal followed.

On appeal, the petitioner claims that the court improperly dismissed his petition for a new trial on the ground that he failed to demonstrate that the DNA evidence was newly discovered, a necessary element for establishing a prima facie case under § 52-270.[10] We disagree.

We begin with the legal principles that govern our resolution of the petitioner's claim. "Pursuant to § 52-270, a convicted criminal defendant may petition the Superior Court for a new trial on the basis of newly discovered evidence. See Practice Book § 42-55. A trial court's decision on that ground is governed by the standard set forth in *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987), and further refined in *Shabazz* v. *State*, 259 Conn. 811, 827–28, 792 A.2d 797 (2002). Under *Asherman*, a court is justified in granting a petition for a new trial when the petitioner demonstrates that the evidence offered in support thereof: (1) is newly discovered such that it could not have been discovered previously despite the exercise of due diligence; (2) would be material to the issues on a new trial; (3) is not cumulative; and (4) is likely to produce a different result in the event of a new trial. *Asherman* v. *State*, supra, 434." *Skakel* v. *State*, 295 Conn. 447, 466–67, 991 A.2d 414 (2010).

On a petition for new trial on the basis of newly discovered evidence, "[t]he question which must be answered [with respect to whether the petitioner had exercised due diligence in preparing his case] is not what evidence might have been discovered, but rather

what evidence would have been discovered by a reasonable [person] by persevering application, [and] untiring efforts in good earnest." (Internal quotation marks omitted.) Id., 507. "It is the *petitioner's* burden to prove that efforts used to find [the evidence] would not have yielded the same result had they been applied earlier." (Emphasis in original.) Id., 514. "This strict standard is meant to effectuate the underlying equitable principle that once a judgment is rendered it is to be considered final, and should not be disturbed by posttrial motions except for a compelling reason." (Internal quotation marks omitted.) *Asherman* v. *State*, supra, 202 Conn. 434.

"The legal principles governing a trial court's decision to dismiss a claim for failure to present a prima facie case pursuant to Practice Book § 15-8 are well settled. A prima facie case, in the sense in which that term is relevant to this case, is one sufficient to raise an issue to go to the trier of fact. . . . In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . In evaluating the [granting of] a motion to dismiss, [t]he evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor. . . . Whether the plaintiff has established a prima facie case entitling the plaintiff to submit a claim to a trier of fact is a question of law over which [this court's] review is plenary." (Internal quotation marks omitted.) *Nemhard* v. *Commissioner of Correction*, 157 Conn. App. 368, 373–74,      A.3d      (2015).

Thus, the issue on appeal is whether the petitioner submitted sufficient evidence, viewed in the light most favorable to him, to satisfy the necessary elements that must be shown to sustain a petition for a new trial. As a threshold matter, the petitioner must present sufficient facts to show that his claim is predicated on newly discovered evidence. Evidence is newly discovered if it was not available at the time of trial, or it could not have been obtained by the exercise of reasonable diligence. *Skakel* v. *State*, supra, 295 Conn. 506–507.

In the present case, the petitioner alleged in his petition for a new trial that the DNA testing methods available at the time of his trial would not have been capable of identifying DNA profiles from the genetic material recovered from the tissues, and thus that the results of DNA testing using the modern STR method were not discoverable or available at the time of his criminal trial. The petitioner's sole witness, Ladd, refuted this claim. Contrary to the petitioner's assertions, Ladd testified that the prior DNA technology was capable of generating a usable DNA profile. Ladd premised his conclusion on the fact that the amount of genetic material in the evidence samples met or exceeded the

amount necessary to perform the Polymarker/DQ-Alpha test.

The petitioner attempted to elicit evidence that the possible presence of PCR inhibitors in the evidence samples would have prevented a DNA profile from being generated. Because the evidence was not submitted for testing prior to the petitioner's criminal trial, Ladd testified that he could not rule out the possibility that there may have been PCR inhibitors present in the evidence samples at that time. Ladd stated, however, that there was no evidence of PCR inhibitors when the testing was performed in 2008. Thus, he concluded, "to a reasonable degree of scientific certainty," that a usable DNA profile could have been generated using the Polymarker/DQ-Alpha test. In light of this testimony, the petitioner failed to offer any evidence to establish one of the essential prima facie elements of his claim.

On appeal, the petitioner argues that there was evidence in the record from which the trial court could have found that it was too speculative to conclude that the petitioner would have been eliminated as a DNA contributor to the soiled tissues had DNA testing been conducted at the time of his criminal trial. The petitioner contends that whether the DNA tests available in 1995 and 1996 would have been capable of generating a DNA profile is "an untested and untestable hypothesis." Thus, he argues, the issue must be resolved in his favor. This argument misconstrues the applicable legal standard. It was the *petitioner's* burden to produce evidence to support his theory that a new trial was warranted in this instance. See *Skakel* v. *State*, supra, 295 Conn. 515. The failure of the petitioner's trial counsel to subject the evidence samples to DNA testing prior to his criminal trial, and his subsequent failure to present any evidence to support the assertions advanced in his petition for a new trial, left the court without any basis from which to draw the necessary inference that the testing available in 1995 and 1996 would not have produced the same results as the 2008 testing.

The petitioner also contends that dismissal of his petition was inappropriate because a fact finder reasonably could have found, on the basis of the evidence presented in support of his petition, that reasonable diligence did not require criminal defendants to pursue DNA testing in 1995 and 1996. More specifically, he argues that Ladd's testimony regarding the limited use of DNA testing in criminal trials in 1995 and 1996 demonstrated that, "while the science behind DNA evidence was gaining acceptance, there was still substantial uncertainty as to how the evidence should be utilized in court." The petitioner further argues that the high probability of a "coincidental inclusion" in 1995 and 1996 presented a significant risk of false inculpatory evidence. Thus, he claims, a fact finder reasonably

could have found that the uncertainty and degree of imprecision surrounding DNA evidence discouraged defense attorneys from seeking DNA testing.[11] The record shows, however, that the petitioner did not present any evidence concerning how the state of DNA technology in 1996 impacted defense lawyers' decisions at that time. More importantly, the petitioner presented no evidence as to the reasons why his own trial attorney did not investigate or seek DNA testing on the soiled tissues at the time of his criminal trial.

"[T]he petitioner has the burden of alleging and proving facts which would, in conformity with our settled equitable construction of the statutes, entitle him to a new trial on the grounds claimed . . . ." *State* v. *Grimes*, 154 Conn. 314, 325, 228 A.2d 141 (1966). Here, the petitioner alleged that the DNA evidence was newly discovered on the ground that it could not have been obtained using the technology that was available in 1995 and 1996. Ladd, however, debunked that proposition entirely, and the petitioner presented no other evidence from which the trier of fact could have drawn an inference to the contrary. Thus, the petitioner cannot succeed on his petition for a new trial, the ground for which must be premised on newly discovered evidence that could not have been discovered by the exercise of reasonable diligence prior to his criminal trial. Accordingly, we conclude that the court properly dismissed the petition.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] There was conflicting testimony at trial on this subject. Medical personnel who treated the victim following the assault testified that she reported that her assailant ejaculated into a tissue. The victim testified that her assailant ejaculated inside her.

[2] The victim testified that D'Amato had prepared a violation of probation arrest warrant based on the victim's drug use and prostitution.

[3] The victim's testimony on cross-examination by defense counsel concerning the tissues, which were marked as an identification exhibit, was as follows:

"Q. And later on you took the police officer back to those same tissues?

"A. That's right.

"Q. And those tissues you claim he wiped himself . . . [b]ut you saw him throw the tissues out the window?

"A. Those were the same tissues he wiped himself off after he had raped me, those were the same tissues.

"Q. Because you later identified those tissues as being the same tissues, isn't that true?

"A. Yeah, they're the same tissues. I seen him thr[ow] them out the window.

"Q. Yes. And a police officer took you back to that scene, that location at Bailey Street, isn't that right?

"A. Yes. What are you trying to say, that I didn't get raped? . . .

"Q. The officer took you back to Bailey where the alleged assault took place, is that correct?

"A. Yes, he did.

"Q. You pointed out these tissues on the ground to the police officer, isn't that right?

"A. Yep."

[4] On appeal, the state argues that the tissues are immaterial because they were not relied upon by the state at trial as a basis for the petitioner's conviction.

[5] General Statutes § 54-102kk provides in relevant part that "any person who was convicted of a crime and sentenced to incarceration may, at any

time during the term of such incarceration, file a petition with the sentencing court requesting the DNA testing of any evidence that is in the possession or control of the Division of Criminal Justice, any law enforcement agency, any laboratory or the Superior Court. . . .”

[6] Using PCR, the DNA molecule is copied, the copy of the DNA molecule is then copied, and so on.

[7] Testing at fifteen loci permits additional points of comparison and, thus, provides additional opportunities for the known individual to be excluded as the source of the DNA.

[8] Ladd explained that in some cases the presence of organic compounds that have not been fully removed during the DNA extraction may inhibit the amplification process. These compounds are referred to as PCR inhibitors. Ladd further explained that PCR inhibitors are a potential factor with both Polymarker/DQ-Alpha and STR testing.

[9] Alternatively, the court concluded that the petitioner could not prevail on the merits under *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987), reasoning that: (1) the evidence was not newly discovered; (2) the evidence would not be material to the issues in a new trial; and (3) the evidence was not likely to produce a different result in a new trial. Because we decide that the court properly dismissed the petition for a new trial, we do not reach this alternative ground.

[10] General Statutes § 52-270 (a) provides: “The Superior Court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed, or the want of actual notice to any plaintiff of the entry of a nonsuit for failure to appear at trial or dismissal for failure to prosecute with reasonable diligence, or for other reasonable cause, according to the usual rules in such cases. The judges of the Superior Court may in addition provide by rule for the granting of new trials upon prompt request in cases where the parties or their counsel have not adequately protected their rights during the original trial of an action.”

[11] On this score, the petitioner claims that the court incorrectly interpreted § 52-270 to require him to prove that the DNA testing available at the time of his criminal trial would not have excluded him as a contributor, which he argues, ignores the “qualitative difference” between DNA technologies then and now.

—————————————————